48 Cal.Rptr.3d 780 (2006)
142 Cal.App.4th 1377
Abigail HERNANDEZ et al., Plaintiffs and Appellants,
v.
HILLSIDES, INC., et al., Defendants and Respondents.
No. B183713.
Court of Appeal of California, Second District, Division Three.
September 14, 2006.
*782 Eisenberg & Associates, Arnold Kessler and Mark S. Eisenberg, Berkeley, for Plaintiffs and Appellants.
Seyfarth Shaw, Laura Wilson Shelby, Holger G. Besch and Amy C. Chang, Los Angeles, for Defendants and Respondents.
*781 CROSKEY, Acting P.J.
Abigail Hernandez and Maria-Jose Lopez (plaintiffs) appeal from the trial court's grant of summary judgment in favor of Hillsides, Inc., Hillsides Children's Center, Inc., and John M. Hitchcock (defendants). Plaintiffs had sued for damages after they had discovered that their employer, a residential facility for abused children, had placed a video camera in the office which they shared. The trial court held that plaintiffs could not prevail on their causes of action for invasion of privacy, intentional infliction of emotional distress, and negligent infliction of emotional distress because plaintiffs: (1) were not recorded or viewed by the surveillance equipment defendants placed in their office; and (2) had a diminished expectation of privacy that was overcome by defendants' need to protect the children residing at their facility.
We hold that a plaintiff need not establish that he or she was actually viewed or recorded in order to succeed on a cause of action for invasion of privacy. Additionally, defendants failed to conclusively establish that plaintiffs had a diminished expectation of privacy, or that their actions were sufficiently justified by the need to protect the children residing at their facility. We therefore reverse. Plaintiffs, however, cannot state a cause of action for intentional infliction of emotional distress, and their cause of action for negligent infliction of emotional distress is legally insufficient and factually superfluous, so summary adjudication should be granted in favor of defendants on those two causes of action.

FACTS AND PROCEDURAL BACKGROUND[1]
Defendants run a residential facility for approximately 66 abused and neglected children between the ages of six and eighteen. Defendant John Hitchcock (Hitchcock) is the Director of the facility. Plaintiffs were employed in clerical positions in the office building on defendants' campus. *783 They shared an office with a locking door and a window with shades that could be drawn for privacy.[2] The door to plaintiffs' office contained a "doggie door" which was missing the swinging flap. On several occasions plaintiff Hernandez used her office to change clothes before leaving for the gym. Plaintiff Jose Lopez occasionally used the office to show Hernandez how her figure was recovering after recently giving birth by raising her shirt to expose her breasts and stomach. Defendants had no knowledge that plaintiffs were using the office for such purposes, but such facts would support a conclusion that plaintiffs had an expectation of privacy while in their office.

1. Defendants Install Motion-Activated Camera in Plaintiffs' Office

Around July 2002, defendants' computer technician, Tom Foster, informed defendants that he believed someone was accessing pornographic websites at night from some of defendants' computers, including the one in plaintiffs' office. Defendants and various department heads and administrative staff members decided to conduct surveillance in areas where the illicit computer access had taken place.[3] Plaintiffs were not advised of this decision because they were considered to be part of a group of employees that "gossiped" and might inadvertently tip off the unknown person(s) defendants were trying to catch.
Hitchcock installed a motion-activated video surveillance system in the computer lab where some of the illicit web access had occurred. The surveillance system was moved to plaintiffs' shared office in October 2002. The camera and motion detector were placed on a shelf in plaintiffs' office and set up to broadcast images to a TV monitor and video recorder located in a storage room across the hall. Only four people were aware that the surveillance equipment had been placed in plaintiffs' office. Plaintiffs were not among those who had such knowledge.
In his deposition, Hitchcock stated that the surveillance camera and motion detector operated "all the time," but that the system had only been "active" three times. The first time, Hitchcock had placed the camera and motion detector in plaintiffs' office after they had left for the day and removed it before they arrived the next morning. Thereafter, Hitchcock had left the camera and motion detector functioning in plaintiffs' office but only twice had "connected" the wireless receptor to the TV monitor and recorder in the storage room. His practice was to connect the receptor before leaving at night and, in order to prevent the camera from transmitting to the TV monitor during the day, disconnect it before plaintiffs arrived for work the following morning. Defendants did not provide any evidence, however, regarding which three dates the surveillance system had been activated.
At approximately 4:30 in the afternoon on Friday, October 25, 2002, plaintiffs noticed a red light on a shelf in their office blinking when there was movement in front of it. They looked more closely and discovered a camera. They followed the cord attached to the camera and discovered that it was plugged in and that the plug was hot to the touch. Plaintiffs notified their supervisor, who called Hitchcock at his home to report the discovery. Hitchcock, who had not been to the facility that *784 day, called Hernandez in her office to explain the surveillance and assure her that the camera had not been installed to observe plaintiffs.
Plaintiffs were extremely upset by their discovery and did not return to work until Wednesday, October 30, 2005. When they returned, plaintiffs asked to view the surveillance tape. Plaintiffs were shown a tape containing scenes of their empty office, Hitchcock adjusting the camera, and about 5 minutes of static. In his deposition, Hitchcock stated that he had been planning to remove the camera the very weekend plaintiffs found it, because there had been no pornographic websites accessed from the computer in plaintiffs' office in the three week period during which he had been periodically "recording" their office.

2. Subsequent Lawsuit and Motion for Summary Judgment

On September 12, 2003, plaintiffs filed suit against defendants for invasion of privacy, intentional infliction of emotional distress, and negligent infliction of emotional distress arising from their discovery of the surveillance equipment in their office. Defendants filed a motion for summary judgment on December 15, 2004 and raised three principal contentions.

a. Publication

Defendants first argued that plaintiffs' cause of action for invasion of privacy must fail because plaintiffs had not been recorded or viewed by the camera installed in their office, and thus, as a matter of law, plaintiffs' privacy could not have been invaded.[4] Defendants asserted that the camera was only "active" three times, and only in the evening hours. Defendants relied on the videotape shown to plaintiffs and Hitchcock's deposition as proof plaintiffs were never viewed or recorded by the surveillance system. Defendants, however, did not provide declarations or depositions from any of the department heads involved in the decision to conduct video surveillance of plaintiffs' office or from any of the persons who had access to the storage room and who could have activated the surveillance system while plaintiffs were in their office.
In response, plaintiffs argued that Hitchcock's deposition stated that the camera was always on and the videotape showed an empty room, indicating that there did not need to be motion to activate the video recorder. Plaintiffs argued Hitchcock's statements that the camera was always on, but that they had never been recorded or viewed, were contradictory.[5] Additionally, plaintiffs noted that Hitchcock was not at Hillsides on the day plaintiffs found the camera, so could not *785 have "deactivated" it that morning, and that defendants did not provide the specific dates on which the surveillance system was "active."

b. Expectation of Privacy

Defendants next argued that even if plaintiffs had been viewed or recorded, they had a diminished expectation of privacy in their jointly occupied office. Defendants argued plaintiffs could not have reasonably expected privacy in their office because: (1) a person could climb over a railing outside plaintiffs' window and peek in; (2) the "doggie door" allowed anyone to bend down and see in the office; and (3) at least eleven people had keys to their office. Defendants also argued that four surveillance cameras throughout the campus and plaintiffs' signatures on computer monitoring policies indicated that they knew they could be "monitored" at any time while on the campus.
Plaintiffs countered that the windows in their office were always closed, and anyone with a need to come into the office while it was occupied would knock on the door for admittance, not lean down and peek in. Regardless of windows and doggie doors, plaintiffs argued, employees may have a reasonably objective expectation of privacy even when their workspace is an open cubicle in a room with dozens of other employees, making it all the more reasonable that an employee in an office with a lockable door would expect to enjoy privacy when the door was closed. Finally, plaintiffs noted that any policy regarding computer monitoring involved monitoring the computer system itself, not the office in which the computer was being used.

c. Justification of Surveillance

Lastly, defendants argued that even if plaintiffs possessed a minimal expectation of privacy, it was overcome by defendants' need to catch the person believed to be accessing pornographic websites at night, in order to protect the children on the campus from potential abuse or exposure to that activity.
Plaintiffs responded that while defendants asserted the surveillance was in response to "pornographic" websites that had been accessed from facility computers, they failed to provide the titles of the websites, did not describe what sort of websites were "pornographic," and had not provided the web logs that justified their decision to conduct a surveillance of plaintiffs' office. Plaintiffs further pointed out that defendants were aware of the "illicit" web access for three months before taking any action to conduct surveillance in plaintiffs' office. Finally, plaintiffs argued that there were less intrusive means for determining the culprit than placing a secret surveillance camera in their office.

3. Resolution of Motion and Appeal

On March 1, 2006, the trial court granted the motion for summary judgment. Judgment was entered in favor of defendants. Plaintiffs filed a timely notice of appeal.

ISSUES ON APPEAL
The arguments made by the parties present four issues: (1) is publication a necessary element of plaintiffs' cause of action for invasion of privacy and, if so, did defendants defeat it? (2) were plaintiffs' expectations of privacy reasonable? (3) did defendants conclusively establish that the surveillance was, under the circumstances, justified? and (4) did defendants defeat plaintiffs' causes of action for the infliction of emotional distress?

DISCUSSION

1. Standard of Review

"`A defendant is entitled to summary judgment if the record establishes as a *786 matter of law that none of the plaintiff's asserted causes of action can prevail.' (Molko v. Holy Spirit Assn. (1988) 46 Cal.3d 1092, 1107[, 252 Cal.Rptr. 122, 762 P.2d 46].) The pleadings define the issues to be considered on a motion for summary judgment. (Sadlier v. Superior Court (1986) 184 Cal.App.3d 1050, 1055[, 229 Cal. Rptr. 374].) As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense. Only then will the burden shift to the plaintiff to demonstrate the existence of a triable, material issue of fact. (AARTS Productions, Inc. v. Crocker National Bank (1986) 179 Cal.App.3d 1061, 1064-1065[, 225 Cal.Rptr. 203].)" (Ferrari v. Grand Canyon Dories (1995) 32 Cal.App.4th 248, 252, 38 Cal.Rptr.2d 65.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 850, 107 Cal.Rptr.2d 841, 24 P.3d 493.) We review orders granting or denying a summary judgment motion de novo. (FSR Brokerage, Inc. v. Superior Court (1995) 35 Cal.App.4th 69, 72, 41 Cal.Rptr.2d 404.) We exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." (Iverson v. Muroc Unified School Dist. (1995) 32 Cal.App.4th 218, 222, 38 Cal. Rptr.2d 35.)

2. Invasion of Privacy Principles

In 1960, Prosser identified four basic privacy interests: (1) intrusion upon seclusion or solitude, or private affairs; (2) public disclosure of embarrassing private facts; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness. (Miller v. National Broadcasting Co., Inc. (1986) 187 Cal.App.3d 1463, 1482, 232 Cal. Rptr. 668.) The case before us involves the right to be secure from intrusion.
California courts have adopted Prosser's analysis and the Restatement formulation of intrusion: "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." (Rest.2d Torts, § 652B; Miller, supra, 187 Cal.App.3d at p. 1482, 232 Cal.Rptr. 668.) Intrusion into private places, conversations, and matters is the privacy tort that best captures the common understanding of an "invasion of privacy" and "is most clearly seen as an affront to individual dignity." (Shulman v. Group W Productions, Inc. (1998) 18 Cal.4th 200, 231, 74 Cal.Rptr.2d 843, 955 P.2d 469 [Shulman].) The Shulman court noted that intrusion cases are inherently fact specific and, as a result, there are no bright line rules identifying the outer boundaries of intrusion. (Id., at p. 237, 74 Cal.Rptr.2d 843, 955 P.2d 469.)
Thus, as applicable to the case before us, the tort of invasion of privacy, or intrusion, has two main elements: (1) intrusion into a private place, conversation, or matter; and (2) in a manner highly offensive to a reasonable person. (Shulman, supra, 18 Cal.4th at p. 231, 74 Cal. Rptr.2d 843, 955 P.2d 469.) Tortious intrusion includes unconsented-to physical intrusion into private places, as well as "unwarranted sensory intrusions such as eavesdropping, wiretapping, and visual or photographic spying." (Shulman, supra, *787 18 Cal.4th at pp. 230-231, 74 Cal.Rptr.2d 843, 955 P.2d 469 [citing Rest.2d Torts, § 652B, com. B and illustrations]; Wilkins v. National Broadcasting Co. (1999) 71 Cal.App.4th 1066, 1075, 84 Cal.Rptr.2d 329.)

3. Publication Is Not An Element of Invasion of Privacy

Defendants argue that plaintiffs could not raise a triable issue of fact as to whether they were recorded or viewed by the equipment defendants placed in their office because the videotape plaintiffs were shown included only footage of their empty office and Hitchcock. Whether plaintiffs were viewed or recorded, however, Hitchcock admittedly had entered plaintiffs' office and secretly placed a functioning camera which was capable of transmitting images from plaintiffs' office to a remote location where such images could be viewed or recorded at will by the activation of a remote receiver.
The tort of invasion of privacy based on an intrusion does not require plaintiffs to prove that private information about them has been disclosed to a third party. (Miller, supra, 187 Cal.App.3d at p. 1484, 232 Cal.Rptr. 668.) A plaintiff is harmed when his or her privacy is invaded in an offensive manner without consent, not when information gained from the intrusion is disclosed or published. The Restatement Second of Torts explains: "[I]nvasion of privacy covered by this Section [intrusion] . . . consists solely of an intentional interference with [plaintiff's] interest in solitude or seclusion, either as to his [or her] person or as to his [or her] private affairs or concerns, of a kind that would be highly offensive to a reasonable [person]." (Rest.2d Torts, § 652B, com. a.) The Restatement continues: "The invasion . . . may be by some other form of investigation or examination into [plaintiff's] private concerns .... The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined." (Id., supra, com. b, emphasis added.) Thus, if unconsented-to disclosure, publication, or viewing of information about the plaintiff is harmful, then the action taken to obtain that private information must itself also be harmful.
Intrusion involves a plaintiff's peace of mind and right to be left alone. The focus is on whether the defendants penetrated "some zone of physical or sensory privacy surrounding, or obtained unwanted access to data about, the plaintiff," not whether the data was ever obtained or disclosed. (Shulman, supra, 18 Cal.4th at p. 232, 74 Cal.Rptr.2d 843, 955 P.2d 469 [emphasis added]; Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc. (2005) 129 Cal.App.4th 1228, 1259, 29 Cal.Rptr.3d 521.) Under Shulman and section 652B of the Restatement, gaining access to information about the plaintiffs that they reasonably believed would remain private is an intrusion into their seclusion.[6] The extent to which images *788 of the plaintiffs were "captured" or "observed" by the defendants or third parties as a result of the defendants' intrusion may have an impact on the amount of damages the plaintiffs may recover, but it does not impact the defendants' liability for the intrusion.
The Legislature, in providing a statutory remedy for the offensive conduct of the so-called "paparazzi" or other persons engaged in similar invasive conduct, has recognized and relied upon this same analysis. Civil Code section 1708.8, subdivision (b), imposes liability for a "constructive invasion of privacy." That subdivision subjects a person to liability when that person "attempts to capture, in a manner that is offensive to a reasonable person, any type of visual image, sound recording, or other physical impression of the plaintiff engaging in a personal . . . activity under circumstances in which the plaintiff had a reasonable expectation of privacy, through the use of a visual or auditory enhancing device, regardless of whether there is a physical trespass, if this image, sound recording, or other physical impression could not have been achieved without a trespass unless the visual or auditory enhancing device was used." While this statute by its terms does not apply to the circumstances of this case, we note that subdivision (j) of section 1708.8 expressly states, "[i]t is not a defense to a violation of this section that no image, recording, or physical impression was captured . . . ."[7] Thus, it is the intrusion into plaintiffs' seclusion itself that is the actionable wrong.
Several courts in other jurisdictions have considered whether an intrusion alone is actionable, and have reached the same result. In a Michigan Appellate Court case, plaintiff and her daughter sued the owner of a roller skating rink, after the two had used the ladies' room in the rink and discovered "that the defendant had installed see-through panels in the ceiling of the restroom which permitted surreptitious observation from above the interior, including the separately partitioned stalls." (Harkey v. Abate (1984) 131 Mich.App. 177, 346 N.W.2d 74, 75.) The court held, over a dissent, that the plaintiff could recover despite having no proof that she and her daughter were viewed. "The type of invasion of privacy asserted by plaintiff does not depend upon any publicity given to the person whose interest is invaded, but consists solely of an intentional interference with his or her interest in solitude or seclusion of a kind that would be highly offensive to a reasonable person. [Citation.] Clearly, plaintiff and her daughter in this case had a right to privacy in the public restroom in question. In our opinion, the installation of the hidden viewing devices alone constitutes an interference with that privacy which a reasonable person would find highly offensive. And though the absence of proof that the devices were utilized is relevant to the question of damages, it is not fatal to plaintiff's case." (Id. at pp. 76 [emphasis added].)
In Carter v. Innisfree Hotel, Inc. (Ala. 1995) 661 So.2d 1174, plaintiff husband and wife discovered that a mirror in their hotel room had been scratched on the back in order to enable someone to view their room from an adjacent room. While it was a disputed issue of fact as to whether someone had actually viewed the plaintiffs in their hotel room, the Alabama Supreme Court concluded that proof that the plaintiffs had been viewed was not a prerequisite *789 for recovery. "There can be no doubt that the possible intrusion of foreign eyes into the private seclusion of a customer's hotel room is an invasion of that customer's privacy." (Id. at p. 1179.)[8]
Finally, in Hamberger v. Eastman (1964) 106 N.H. 107, 206 A.2d 239, plaintiffs rented a house adjacent to the house of their landlord. They discovered the defendant had installed in their bedroom a listening and recording device, which was connected by wires to the defendant's house. Defendant argued there could be no cause of action as plaintiff's did not allege that anyone listened to any sounds from their bedroom. The New Hampshire Supreme Court disagreed, holding that "actual or potential" publicity with respect to private matters constitutes a compensable injury. (Id. at p. 242.)
Thus, we conclude that the mere placement of the surveillance equipment on the shelf in plaintiffs' office itself invaded their privacy because it allowed the defendants, or anyone with access to the storage room, to "activate" the surveillance system at any time during the day without plaintiffs' knowledge, thus at least presenting the possibility of unwanted access to private data about plaintiffs. (Shulman, supra, 18 Cal.4th at p. 232, 74 Cal.Rptr.2d 843, 955 P.2d 469.) Plaintiffs need not show more in order to establish their cause of action.[9]

4. Defendants Did Not Establish that Plaintiffs Did Not Have a Reasonable Expectation of Privacy in Their Office

As a matter of law, a claim of intrusion cannot fail merely because the events or conversations which the defendant intruded upon were not completely private from all other eyes and ears. (Sanders v. American Broadcasting Companies (1999) 20 Cal.4th 907, 911, 85 Cal. Rptr.2d 909, 978 P.2d 67.) Privacy is not a binary, all-or-nothing characteristic; it has degrees and nuances. (Id. at p. 916, 85 Cal.Rptr.2d 909, 978 P.2d 67.) An expectation of privacy in a given setting is not unreasonable just because the privacy expected is not complete or absolute. (Ibid.) "[I]n the workplace, as elsewhere, the reasonableness of a person's expectation of *790 visual and aural privacy depends not only on who might have been able to observe the subject interaction, but on the identity of the claimed intruder and the means of intrusion." (Id. at p. 923, 85 Cal.Rptr.2d 909, 978 P.2d 67.)
While plaintiffs did not enjoy complete and absolute privacy in their office, it was reasonable for them to expect images of them in their office with the door closed would not be transmitted to another portion of the building. Hitchcock was not leaning down and peeking through the doggie door or peering through the window in the office, but he was, in effect, secretly hidden in the office with plaintiffs via the installed surveillance equipment which had the ability to transmit plaintiffs' images onto the monitor in the storage closet across the hall. The fact that plaintiffs were employees and that a passerby in the hallway could have attempted to look in the office via the doggie door does not, as a matter of law, deny them protection against the unwanted intrusion represented by defendants' secret installation of a hidden camera.

5. Factual Issues Remain As To The "Offensiveness" of Defendants' Conduct And Their Claimed Justification

a. The "Offensiveness" Issue

If a defendant has intruded on a plaintiff's objectively reasonable privacy, the plaintiff must next establish the intrusion was "highly offensive" in order to recover. "Offensiveness inquires as to the degree of intrusion, the context, the conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." (Wilkins v. National Broadcasting Co., supra, 71 Cal.App.4th at p. 1075-76, 84 Cal.Rptr.2d 329, quoting Miller v. National Broadcasting Co., Inc., supra, 187 Cal.App.3d at pp. 1483-1484, 232 Cal.Rptr. 668.) Whether or not something is offensive also depends on the particular method of intrusion used. (Shulman, supra, 18 Cal.4th at pp. 236-37, 74 Cal.Rptr.2d 843, 955 P.2d 469.) Difficult cases involve photographic and electronic recording equipment because of the potential for use in ways that severely threaten personal privacy. (Shulman, supra, at p. 237, 74 Cal.Rptr.2d 843, 955 P.2d 469.) There is no bright line rule on this question, and every case must be determined on its facts. (Ibid.)
A reasonable jury could conclude that the intrusion into plaintiffs' office in this case is highly offensive. Defendants placed a motion-activated camera in a private office shared by plaintiffs, and left it functioning for no legitimate reason while plaintiffs were present. Nor did defendants alert plaintiffs to the presence of the camera, so they could modify their behavior to protect their own privacy. Under these circumstances, defendants have not established as a matter of law that their conduct was not highly offensive. Thus, a triable issue of fact exists which must be resolved upon remand.

b. The Justification Issue

Defendants argue that their surveillance was necessary and justified to catch whoever was accessing illicit pornographic websites in the early hours of the morning, in violation of Hillsides' computer usage policies. The only evidence, however, offered by defendants to show their need to engage in this surveillance is the declaration of Tom Foster, the computer technician, and the deposition of Hitchcock. While Foster stated that in July 2002 the web logs he maintained for Hillsides in their mainframe computer indicated *791 that illicit pornographic websites had been accessed, he offered no description of the type of sites accessed, how frequently, or their web addresses. Hitchcock has consistently stated that the web logs reflected websites that justified surveillance of plaintiffs' office, but has never provided the logs, the titles of the websites, or any description of the websites more elaborate than "immoral," "illicit," and "pornographic." While it is possible that these websites are so alarming and potentially threatening to the well being of children at Hillsides that surveillance would be justified, defendants simply do not offer anything more than conclusory statements that they had information that the websites were pornographic and being accessed from a computer in plaintiffs' office. Why defendants failed to produce this presumably compelling evidence in support of their motion for summary judgment was not explained.
Even assuming, arguendo, that defendants were justified in their actions, it is undisputed that the offensive websites were only being accessed at night. Hitchcock admitted the camera did not need to be in the office during the hours that plaintiffs were working and that he had no suspicions as to plaintiffs' activities. In fact, the first occasion Hitchcock used the surveillance system in plaintiffs' office, he placed the camera and motion detector in the office after hours and removed it prior to plaintiffs' arrival the next morning. Defendants offer no explanation as to why the second and third occasions required leaving the camera and motion detector in plaintiffs' office during the day for three weeks when any of the four people with knowledge of the surveillance system could have activated the system without plaintiffs' knowledge. Thus, defendants have failed to conclusively establish their surveillance was justified under the circumstances. This is another issue that must be resolved by a trier of fact.

6. Intentional Infliction of Emotional Distress and Negligent Infliction Emotional Distress

Invasion of a person's peace of mind is an independent wrong that, in and of itself, gives rise to liability. (Shulman, supra, 18 Cal.4th at p. 232, 74 Cal.Rptr.2d 843, 955 P.2d 469.) Intentional infliction of emotional distress requires "`"`extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard [for] the probability of causing, emotional distress'"`" (Wilkins v. National Broadcasting Co., Inc. supra, 71 Cal.App.4th at p. 1087, 84 Cal.Rptr.2d 329.) The conduct must be "so extreme and outrageous `as to exceed all bounds of that usually tolerated in a civilized society.'" (Ibid.) Given that the placement of the camera was not intended to spy on plaintiffs and, in fact, was only intended to be activated when they were not in the office, we find, as a matter of law, that defendants' conduct does not rise to the level of "extreme and outrageous." Thus, plaintiffs cannot prevail on their cause of action for intentional infliction of emotional distress. Summary resolution of this cause of action in favor of defendants is appropriate.
As to plaintiffs' cause of action for negligent infliction of emotional distress, "[t]he negligent causing of emotional distress is not an independent tort but the tort of negligence, involving the usual duty and causation issues." (6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1004, p. 270.) Plaintiffs' complaint alleges no duty breached, but only alleges that defendants' intentional act of placing the camera in their office caused them emotional distress. Emotional distress damages may be recoverable as part of the *792 general damages if plaintiffs prevail on their invasion of privacy cause of action. (CACI No. 1820.) As such, plaintiffs' purported cause of action for "negligent infliction of emotional distress" is both legally without merit and factually superfluous. Summary resolution of this cause of action is thus also appropriate.

DISPOSITION
The judgment is reversed. The matter is remanded with directions to vacate the order granting the motion for summary judgment and enter a new and different order denying the motion for summary judgment and granting summary adjudication of plaintiffs' causes of action for intentional infliction of emotional distress and negligent infliction of emotional distress. The trial court shall then conduct such further proceedings as are appropriate in a manner not inconsistent with the views expressed herein. Plaintiffs shall recover their costs on appeal.
KITCHING and ALDRICH, JJ., concur.
NOTES
[1] The facts we recite are set forth in the papers filed by the parties in support of and in opposition to defendants' motion for summary judgment.
[2] Plaintiffs assert the shades are always drawn, but what is important for the purposes of this opinion is that plaintiffs' office can be sufficiently concealed from view.
[3] Defendants had purchased the surveillance equipment in February 2002 for the purpose of preventing thefts in the administration building.
[4] Similarly, defendants argued that because plaintiffs were never viewed or recorded by the surveillance equipment placed in their office, the defendants' conduct was not sufficiently outrageous to support a cause of action for intentional infliction of emotional distress.
[5] Plaintiffs misunderstand Hitchcock's deposition testimony, which is not inconsistent with regard to the operation of the camera and the recording equipment. Hitchcock has consistently testified that the camera is "on" when it is plugged in, but would only transmit images for recording and/or viewing on the TV monitor if the "receptors" in the storage room were connected to the TV monitor and recorder. Hitchcock's testimony was that, in order to prevent the camera from transmitting or recording during the day, he would "disconnect" the camera receptors from the TV monitor and recorder in the storage room. Thus, the camera was technically "on" because it was plugged in to the wall in plaintiffs' office, but if the receptors were disconnected, as Hitchcock testified, there would be no way for any image of plaintiffs' office to appear on the TV monitor.
[6] CACI No. 1800 also reflects this interpretation of Intrusion. Notably, this approved jury instruction does not require that the jury find the plaintiffs were captured or observed by the intrusion, merely that the intrusion occurred:

To establish a claim of intrusion plaintiffs must prove all of the following:
"1. That [plaintiffs] had a reasonable expectation of privacy in [insert facts regarding the place, conversation, or other circumstance];
2. That [defendants] intentionally intruded in [insert facts regarding the place, conversation, or other circumstance];
3. That [defendants'] intrusion would be highly offensive to a reasonable person;
4. That [plaintiffs] was harmed; and
5. That [defendants'] conduct was a substantial factor in causing [plaintiffs'] harm."
[7] Similarly, Penal Code § 632, which prohibits recording confidential communications, is violated the moment the recording is made without consent, regardless of whether it is subsequently disclosed. (Marich v. MGM/UA Telecommunications, Inc. (2003) 113 Cal. App.4th 415, 425, 7 Cal.Rptr.3d 60.)
[8] In New Summit Assocs. Ltd. v. Nistle (1987) 73 Md.App. 351, 533 A.2d 1350, plaintiff found scratches on the back of the bathroom mirror in her apartment, which allowed her bathroom to be viewed by someone in the neighboring vacant apartment, which was undergoing renovations. The court concluded the plaintiff "was not required to prove that a particular individual actually observed her while she used the facilities in her bathroom. The intentional act that exposed that private place intruded upon [plaintiff's] seclusion." (Id. at p. 1354.) However, the court held that the plaintiff could not recover from the landlord and management company defendants, as there was no proof either of them (or their agents) had committed the intrusion. (Ibid.)
[9] In any event, even if publication were an element of the intrusion cause of action, defendants failed to defeat it. Defendants offer only Hitchcock's deposition testimony as evidence that plaintiffs were never viewed, despite the fact that Hitchcock himself stated that three other people knew where the surveillance system was located, where it was broadcasting, and were able to access the locked storage room. Moreover, while defendants argue that the system was only set up to record three times, they offer no dates or estimates as to when those incidents occurred. Hitchcock stated that he would activate the system at night and deactivate it in the morning, yet he was not at Hillsides on the day that the system was found and thus could not have deactivated it that morning. Therefore, even if publication or "viewing" were an element of invasion of privacy, there would remain a triable issue of fact as to what dates and what times of the day the surveillance system was recording and/or broadcasting and whether or not anyone besides Hitchcock had used the storage room during the three weeks he had used it as the "control room" for the surveillance.